## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Criminal No.** _____ |
| | ) | |
| | ) | **Violation:** |
| **v.** | ) | |
| | ) | **18 U.S.C. § 1349** |
| | ) | |
| | ) | |
| **CARLISLE HMA, LLC** | ) | |

### INFORMATION

THE UNITED STATES CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Information:

#### The Federal Health Care Programs and
#### The Provision of and Reimbursement for Hospital Care

1.    The Medicare Program ("Medicare") was a Federal health care program providing benefits to persons who were 65 or over or disabled.  Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare and Medicaid Services ("CMS"), and its contractors.

2.    The Medicaid Program ("Medicaid") was a Federal health care program providing benefits for low-income patients.  Funding for Medicaid is shared between the federal and state governments.  At the Federal level, Medicaid is administered by CMS.

3.    TRICARE was a federally-funded medical insurance program for military personnel, their spouses and unmarried dependent children under the age of 22, administered by the TRICARE Management Activity, pursuant to 10 U.S.C. §§ 1071-1177.

4.     Medicare, Medicaid and TRICARE were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

5.     Health care providers who furnished health care services that were reimbursed by Federal health care programs had to ensure that such services would "be provided economically and only when, and to the extent, medically necessary."  42 U.S.C. § 1320c-5(a)(1); 42 C.F.R. § 1004.10.

6.     When a patient visited a hospital's emergency department (hereafter referred to as the "ED"), a patient was typically examined by an ED physician who determined the patient's medical condition.  Based on the severity of a patient's condition and the expected course of treatment, an ED physician would make a recommendation to an admitting physician (the patient's personal physician or a hospitalist) about whether the patient should be:

        a.     admitted to the hospital for inpatient treatment;

        b.     observed in a hospital bed for a period typically lasting up to 24 hours but not exceeding 48 hours, after which time a decision could be made about whether the patient required hospital admission; or

        c.     treated in the ED and discharged.

7.     The Medicare Program Integrity Manual provided that "[i]npatient care, rather than outpatient care, is required **only if** the beneficiary's medical condition, safety or health would be significantly and directly threatened if care was provided in a less intensive setting."  Chapter 6, Section 6.5.2 (emphasis added).

8.      The decision whether to (a) admit a patient, (b) treat a patient in observation status, or (c) treat a patient as an outpatient in the ED and discharge the patient had significant financial consequences for the hospital.  Hospitals derived a large portion of their revenues from payments for inpatient care, and were generally paid thousands of dollars more to treat a patient who was billed as an admitted patient than one who was billed as an outpatient or under observation.

9.      Medicare Part A (Hospital Insurance) covered inpatient hospital services. Hospitals submitted claims for payment for inpatient hospital services under Medicare Part A after a patient was discharged from the hospital.  Initially, hospitals submitted a patient-specific claim for interim payment for each discharged patient.

10.     Medicare Part B (Medical Insurance) covered outpatient hospital services. Hospitals submitted claims for payment for outpatient hospital services, which included both (a) observation services and (b) treatment provided to a patient in an ED under Medicare Part B. Outpatient services provided to a patient were assigned a classification and reimbursed at a rate set by Medicare for that classification.  Generally, the more complex the services, the higher the reimbursement.

11.     Medicare Part B also reimbursed physicians for their professional services provided in a hospital setting, pursuant to a Physician Fee Schedule.  Physicians billed Medicare for their examinations of patients in hospital EDs under one of five evaluation and management codes, depending on the complexity of the examination.  Generally, the more complex the examination, the higher the reimbursement.

12.     Patient-specific hospital services were billed to and reimbursed by Medicaid and TRICARE in generally the same manner as Medicare.

13.     In addition to patient specific claims for both inpatient and outpatient hospital services, hospitals who were Medicare providers were required to annually submit a hospital cost report. The cost report was the hospital's final claim for payment from Medicare for the services rendered to all program beneficiaries for a fiscal year. Medicare relied on the hospital cost report to determine whether the provider was entitled to more reimbursement than it had already received through interim payments, or whether the provider had been overpaid and had to reimburse Medicare.

14.     The federal Anti-Kickback Statute, in general terms, criminalized the offer, payment, solicitation, and receipt of remuneration in exchange for ordering, or arranging for, or recommending ordering any service or item for which payment may be made, in whole or in part, by a Federal health care program. 42 U.S.C. § 1320a-7b(b).

15.     In order for hospitals and physicians to participate as Medicare providers and receive payment from Medicare, they had to enter into Provider Agreements with CMS. As part of that agreement, the provider had to certify that:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

16.     Medicare would not pay a hospital's claims for services that it knew were not medically necessary or that were provided in violation of the Anti-Kickback Statute.

17.     Every hospital cost report also contained a certification page that had to be signed by the chief administrator of the hospital provider or his or her designee, who had to certify that he or she was "familiar with the laws and regulations regarding the provision of health care services

4

and that the services identified in this cost report were provided in compliance with such laws and regulations," including the laws and regulations that required services to be medically necessary and comply with the Anti-Kickback Statute.

18.     Similarly, in order to participate as Medicaid and TRICARE providers and receive payment from the Medicaid and TRICARE programs, hospitals and physicians had to sign Medicaid provider agreements, which vary from state to state, and TRICARE provider agreements, and certify, among other things, that the provider would comply with all applicable federal and state laws and regulations, including the law and regulations that required services to be medically necessary and the Anti-Kickback Statute. State Medicaid programs and TRICARE would not pay a hospital's claims for services that they knew were not medically necessary or provided in violation of the Anti-Kickback Statute.

### The Defendant and Relevant Entities

19.     Health Management Associates, Inc. ("HMA") was a publicly-traded, Delaware-based for-profit corporation headquartered in Naples, Florida that indirectly owned and operated, at various times, over 70 general acute care for-profit hospitals primarily in rural communities across the United States (collectively, "the HMA Hospitals").

20.     Defendant Carlisle HMA, LLC d/b/a Carlisle Regional Medical Center ("**CARLISLE RMC**") was a wholly-owned indirect subsidiary of HMA and operated a small rural hospital located in Carlisle, Pennsylvania.

21.     Company A was one of the companies that HMA contracted with to provide ED physician and management services at HMA Hospitals. HMA was Company A's largest hospital customer. Under its arrangements with HMA Hospitals, Company A billed and received payment

from Federal health care programs for physician services provided at HMA Hospitals. Some HMA Hospitals also paid a management fee to Company A for managing the ED.

22.     Company A hired or contracted with emergency medicine physicians and hospitalists to provide professional services at HMA Hospitals, who were paid an hourly rate. Company A also employed physicians as medical directors at the HMA Hospitals it serviced, who were paid a monthly salary for their services and an hourly fee for clinical services provided to hospital patients.

23.     HMA Hospitals' contracts with Company A generally provided that the parties to the contract could terminate the contract with 60 to 90 days' notice without cause after the first year and that the HMA Hospital CEO could direct Company A to remove any ED physician working at an HMA hospital at any time without cause.

24.     From in or around May 2008 to in or around February 2012, HMA contracted with Company A to staff **CARLISLE RMC**'s ED. From in or around September 2010 to February 2012, HMA contracted with Company A to provide hospitalist services at **CARLISLE RMC**. From in or around February 2012 to at least December 2012, HMA contracted with another third party ED physician and management service to staff the ED at **CARLISLE RMC**.

25.     From at least 2008 to at least 2013, **CARLISLE RMC** was enrolled as a provider in the Medicare, Medicaid and TRICARE programs and billed and received payment from these Federal health care programs. At certain times between 2010 and 2014, **CARLISLE RMC** submitted annual hospital cost reports to the Medicare program covering the time periods July 2009 to June 2012.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

26.    Paragraphs 1 through 25 of the General Allegations section are re-alleged and re-incorporated as though fully set forth herein.

27.    Beginning in 2008 and continuing through at least 2012, in the Middle District of Pennsylvania and elsewhere, certain administrators at **CARLISLE RMC**, acting as agents of **CARLISLE RMC**, at least in part for the benefit of **CARLISLE RMC,** and within the scope and course of their employment and authority at **CARLISLE RMC**, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with (1) certain executives at HMA, (2) certain administrators at the HMA Hospitals, (3) certain administrators and executives of Company A, and (4) others, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid and TRICARE, and to obtain, by means of false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

28.    It was a purpose of the conspiracy for certain administrators at **CARLISLE RMC**, certain executives of HMA, certain administrators at the HMA Hospitals, certain executives and administrators of Company A, and others to unlawfully enrich and benefit the HMA Hospitals (including **CARLISLE RMC**), HMA, Company A, and themselves, by unlawfully pressuring and inducing physicians serving HMA Hospitals (including **CARLISLE RMC**), including physicians

who worked for Company A, to increase the number of ED patient admissions without regard to whether the admissions were medically necessary, all so that the HMA Hospitals (including **CARLISLE RMC**) could bill and obtain reimbursement for higher-paying inpatient hospital care, as opposed to observation or outpatient care, from Federal health care programs and increase HMA's revenue.

### Manner and Means

The manner and means by which the Defendant and its co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

29.     Beginning in or around September 2008, HMA executives instituted a formal and aggressive plan to improperly increase overall ED inpatient admission rates at all HMA Hospitals. As part of the plan, HMA executives set mandatory company-wide admission rate benchmarks for patients presenting to HMA Hospital EDs - a range of 15-20% for all patients presenting to the ED, depending on the HMA Hospital, and then 50% for patients 65 and older (i.e. Medicare beneficiaries) – solely to increase HMA revenue.

30.     These mandatory admission rate benchmarks were not put in place to improve the level of patient care, and were not based on an assessment of the medical needs of the patient mix at particular hospitals or the medical services that particular hospitals were equipped to provide to patients. The benchmark admission rate set by HMA executives for **CARLISLE RMC** was 20% for all patients presenting to the ED and then 50% for patients 65 and older, even though **CARLISLE RMC**'s historical ED admission rate was around 10-13%, which was in line with ED admission rates for other similar hospitals, and **CARLISLE RMC** lacked specialty care to treat many seriously ill patients. Specifically, **CARLISLE RMC** was not a trauma center and did not have 24-hour interventional cardiology, cardiac surgery, neurology, or neurosurgery services to

treat heart attack or stroke victims, and did not have an inpatient pediatric unit. Hershey Medical Center, a major university hospital and Level 1 trauma center, was located within 40 miles of Carlisle RMC.

31.     The scheme to increase ED inpatient admission rates and maximize revenue was executed through various improper means, including by HMA executives pressuring and coercing HMA Hospital administrators (including **CARLISLE RMC** Administrators A and B), contracted ED physician practice groups, including Company A, and medical directors and physicians treating HMA's ED patients to meet mandatory admission rate benchmarks in the following improper ways, among others:

a.     HMA executives directed HMA Hospital administrators, including **CARLISLE RMC** Administrators A and B, to generate daily "Physician's Activity Reports" using a customized software program that tracked each ED physician's admissions statistics relating to patients he or she treated and corresponding color-coded "Physician's Scorecards," which indicated in red whether the physician had failed to meet the mandatory admissions benchmark. At some HMA Hospitals, these scorecards were posted in the physicians' workspace and improperly used to pressure physicians with "failing" admission grades to admit patients who did not require inpatient admission;

b.     HMA executives and HMA Hospital administrators, including **CARLISLE RMC** Administrators A and B, tracked ED physicians' "admission overrides" in the "Physician's Activity Report." These were instances in which an ED patient met pre-programmed criteria for inpatient admission in the customized software program but the ED physician, using his or her clinical judgment, disagreed and manually overrode the computerized designation. At some HMA Hospitals, ED physicians whose admission override rates were over a mandatory benchmark were

9

given "failing" admission grades and these override rates were improperly used to pressure ED physicians with "failing" grades to admit patients who did not require inpatient admission;

      c.      HMA executives ordered HMA Hospital administrators, including **CARLISLE RMC** Administrators A and B, to interrogate ED physicians about alleged "missed" admissions and admission overrides during daily meetings which was designed to improperly pressure the ED physicians to admit patients who did not require inpatient admission. Certain HMA Hospital administrators, including **CARLISLE RMC** Administrator A, threatened to fire ED physicians and medical directors if the ED physicians did not increase the number of admissions of patients they treated, regardless of whether the patients required inpatient admission. In some instances, HMA executives fired HMA Hospital administrators who were unwilling to improperly challenge ED physicians' admission status determinations;

      d.      HMA executives prepared, distributed, and improperly used "Forced Rank Reports" that ranked HMA Hospital EDs according to ED inpatient admission rates and grouped HMA Hospitals that met the mandatory corporate benchmark for the month above the line, and those that failed to meet it below the line. HMA executives warned HMA Hospital administrators whose hospitals fell below the line, including **CARLISLE RMC** Administrator A, that they would be fired unless their admission rates increased. In turn, HMA Hospital administrators, including **CARLISLE RMC** Administrators A and B, pressured Company A executives and administrators, ED medical directors and physicians to admit more patients and demanded that Company A fire medical directors and ED physicians who refused to "get with the program" and maximize admissions through improper methods;

      e.      HMA executives instructed HMA Hospital administrators to pressure their

ED physicians not to place patients in observation status, and to admit them as inpatients regardless of whether they met medical necessity criteria. In some instances, HMA executives instructed HMA Hospital administrators to disregard communications from patients' primary care physicians and case managers to place patients in observation status. At some HMA Hospitals, the option for physicians to place patients in observation status was removed from admission paperwork for a period of time;

      f.      HMA executives and HMA Hospital administrators, including **CARLISLE RMC** Administrators A and B, also implemented mandatory benchmarks for calls from ED physicians to patients' primary care physicians to discuss admission status determinations, and tracked and reviewed individual ED physicians' compliance with these mandatory benchmarks, for the improper purpose of increasing inpatient admissions without medical necessity. HMA executives instructed Company A administrators and ED physicians that the purpose of these calls was to "sell admissions" to primary care physicians. If an ED physician's admission rate for the patients he or she treated fell below the mandatory corporate benchmark, HMA executives directed Company A management to train the ED physician on how to sell admissions during telephone calls with primary care physicians. ED physicians were told not to solicit the primary care physician's advice about the admission status determination, but instead to tell the physician that the patient should be admitted; and

      g.      HMA used monetary bonuses to induce ED physicians to increase their rates of hospital admissions without regard to whether inpatient admission was required. At certain HMA Hospitals, HMA contracted with Company A to pay bonuses to ED physicians who satisfied the mandatory corporate benchmarks for admission overrides and calls to primary care physicians, which was designed by HMA to increase inpatient admissions without regard to medical necessity.

11

32.    Company A executives and administrators collaborated with HMA executives and HMA Hospital administrators, including **CARLISLE RMC** Administrators A and B, in pressuring, coercing, and offering inducements to ED medical directors and physicians to recommend the admission of and admit ED patients who did not need and did not qualify for inpatient admission by, among other means:

a.    enforcing HMA's mandatory corporate benchmarks for ED admissions without regard to whether inpatient admission was required, requiring calls to primary care physicians to sell improper admissions, and improperly using data such as admissions overrides to pressure its ED physicians to admit patients who did not meet medical necessity criteria;

b.    agreeing to HMA's payment of bonuses to ED medical directors and physicians who met mandatory corporate benchmarks designed to increase improper admissions;

c.    training its physicians to "sell admissions" in telephone calls to primary care physicians rather than engage in a meaningful consultation about the patients' medical needs;

d.    instructing ED medical directors and physicians to admit patients who did not meet medical necessity criteria;

e.    at HMA's request, threatening to terminate and terminating medical directors and physicians who refused to follow HMA's improper procedures to maximize admissions; and

f.    firing its own corporate managers who refused to comply with HMA's orders to maximize admissions through improper methods.

33.     As a result of the above-described pressure to admit from HMA executives, **CARLISLE RMC** Administrators A and B, Company A executives and administrators, and others, ED physicians staffing **CARLISLE RMC**'s ED recommended, in certain instances, inpatient admissions that were not medically necessary, and physicians with admitting privileges at **CARLISLE RMC** admitted, in certain instances, patients who did not need inpatient admission.

34.     As a result, **CARLISLE RMC** billed and received payments from Federal health care programs for inpatient admissions that were not medically necessary.

35.     As a further result, in or around January 2012, **CARLISLE RMC** submitted a cost report to Medicare covering the time period July 2010 to June 2011, in which **CARLISLE RMC** Administrator A made materially false, fraudulent and misleading representations that the services identified in the **CARLISLE RMC** cost report "were provided in compliance with the laws and regulations" regarding the provision of health care services, when in fact certain services were not medically necessary.

All in violation of Title 18, United States Code, Section 1349.

Date: _9/25/2018_

SANDRA L. MOSER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ROBERT A. ZINK
ACTING PRINCIPAL DEPUTY CHIEF


JOSEPH S. BEEMSTERBOER
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION

SALLY B. MOLLOY
ASSISTANT DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION